FRED G. MEIS, ESQ., STATE BAR NO. 030712
JOSEPH JAMES POPPEN, ESQ., STATE BAR NO. 239282
TABATHA YIN, ESQ., STATE BAR NO. 246197
LEON V. ROUBINIAN, ESQ., STATE BAR NO. 226893
MEIS & ASSOCIATES
100 Bush Street, Suite 1800
San Francisco, CA 94104-3920
Telephone: (415) 981-4612
Facsimile: (415) 398-5060
Email: fredgmeis@hotmail.com

Attorneys for Plaintiff MICHAEL GALATI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MICHAEL GALATI,<br><br>    Plaintiff,<br><br>v.<br><br>COUNTY OF SAN MATEO; SAN MATEO COUNTY SHERIFF'S DEPARTMENT; GREG MUNKS individually and in his official capacities as sheriff for the COUNTY OF SAN MATEO; DON HORSLEY individually and in his former official capacities as sheriff for the COUNTY OF SAN MATEO; SALVADOR ZUNO individually and in his official capacities as a sheriff's deputy for the COUNTY OF SAN MATEO; VICTOR LOPEZ individually and in his official capacities as a sheriff's deputy for the COUNTY OF SAN MATEO and DOES 1 to 100 Inclusive,<br><br>    Defendants. | Case No. CV 07 4035 CW<br><br>**DECLARATION OF PLAINTIFF MICHAEL GALATI IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**<br><br>Date: February 21, 2008<br>Time: 2:00 p.m.<br>Dept.: Courtroom 2, 4th Floor<br>Judge: Hon. Claudia Wilken |

---

DECLARATION OF MICHAEL GALATI    1

I, MICHAEL GALATI, declare:

1. I am the plaintiff in the above-captioned proceedings. I have personal knowledge of the facts contained within this declaration. If called upon to do so, I could and would testify to the facts contained herein in a competent matter.

2. On or about July 11, 2006, I arrived at the CalTrain station in San Mateo, California with the intent to take a train to San Francisco that afternoon.

3. At approximately 2:00 P.M. the train to San Francisco (CalTrain #151) began pulling into the San Mateo CalTrain station. As the train approached, the conductor began to slow the train to about 2 MPH. She then stuck her head out the window and began yelling at me in an abusive manner for allegedly crossing the marked caution line with my bicycle. I did not understand why she was yelling at me, as I was behind the yellow caution line at all times when the train was approaching.

4. I have reviewed the portion of the police report attached as Exhibit B to the Declaration of Eugene Whitlock where it states that I was blocking the road tracks for Caltrain #151. See Incident Report at pg. 5. This statement is absolutely false. Again, I was behind the caution line when the train was approaching.

5. Once the train had pulled into the station, I boarded the train. After I boarded, I was joking around with another passenger about this odd incident. Then, the train conductor, who I believe was one Ms. Gallo, yelled at me from the second level engineer room to get off the train. I did not understand why she was asking me leave, but nevertheless removed my bike from the bike rack and exited the train. The Incident Report at pg. 6 indicates that I yelled racial slurs at Ms. Gallo. This is a malicious falsehood; I never did such a thing.

6. I then waited for the next train, which was due to arrive in approximately (30) minutes. At no time while I was waiting did any individual ever ask me to leave the station, or even approach

DECLARATION OF MICHAEL GALATI

about what happened on CalTrain # 151..

7. At approximately 2:35 p.m. another train (#253) heading towards San Francisco pulled into the station. Before I boarded the train, the conductor, who I believe was one Joe Allred, exited the train and stuck his hand out toward me. As a result, I never even attempted to even enter train # 253, let alone enter that train, as certain declarations in support of summary judgment suggest. Joe Allred was outside the train during the entirety of our short discussion.

8. Mr. Allred then told me in an aggressive manner that I would not be permitted to board the train. Wanting to know how to get a refund, I pulled out the train ticket from pocket and showed it to Mr. Allred. I asked him how I could get a refund. He replied not from him, and to look at the back of the ticket.

9. At that point, I had been waiting for approximately 30 minutes. I was frustrated by the situation, but in no way physically aggressive. I have reviewed the security footage of this incident, which shows that I was standing with my bicycle for the entirety of my conversation with Mr. Allred, until I stepped back away from the train and away from Mr. Allred. The security footage is an accurate recording of what happened.

10. Shortly thereafter, I noticed an individual who I believe to be Deputy Lopez aggressively charging toward me. He was no more than 6 steps away from me when I first noticed him. I stood still as he charged toward me.

11. Deputy Lopez was approximately 2-3 steps away from me when he first yelled at me to "sit down." Almost simultaneously with this command, Deputy Zuno grabbed me from behind without any warning and put me in a bear hug. The security footage, which corroborates this testimony, is an accurate recording of what happened.

12. I have reviewed the Incident Report attached as Exhibit B to the Declaration of Eugene Whitlock. On pg 5, the Report states that Deputy Lopez verbally ordered me to "step back" and

that I replied with expletives. This is absolutely false, as it was a matter of seconds before the deputies appeared on the scene and seized me without any warning. Furthermore, I was already away from both the train and any conductors. There was nothing to step back from and therefore they had no reason to instruct me to step back.

13. The Report then follows, "Deputy Lopez reiterated his command and motioned for [me] to step away from the train crew." This is yet another conscious falsehood, as the security footage clearly shows there was no such deliberate exchange, or even time for such a deliberate exchange.

14. At no time during this incident did I ever swing my bike at either deputy. I never even had the opportunity to do such a thing. The security footage I reviewed demonstrates that such an allegation is laughable.

15. Although it is not even mentioned in the Incident Report, neither did I ever pin my bicycle on top of a deputy. This is yet another malicious fabrication.

16. After Deputy Zuno put me in a "bear hug" without warning, he swung me around toward a bench. Shortly thereafter, I had no choice but drop my bicycle to the side. I was not resisting at any point, and was completely overpowered by the two deputies. The security footage shows the speed, force and domination by which they seized me and took me down

17. After approximately seven to ten seconds of being swung around in a "bear hug", I was able to come to a knee so as to avoid landing on top of Deputy Lopez. At no point did I strike either deputy with my arms or elbows.

18. Thereafter, Deputy Lopez came behind me and handcuffed me.

19. While I was being handcuffed and my hands were behind me, Deputy Zuno came around and forcefully kicked me twice in ribs, striking me with the tip of his boot.

20. Deputy Zuno then told in me in a taunting manner, "You're going to jail."

21. My ribs were in severe pain following this incident. This pain continued until my release

from jail on July 31, 2006.

22. I was then taken to jail and arrived there at approximately 3:10 p.m.

23. Later that day, at approximately 5:30 p.m., I informed a woman, who I believe was named Dr. Ruth, that my ribs were in pain. Dr. Ruth informed me that only life threatening medical problems would be addressed. Nevertheless, I placed two inmate requests for the pain in my ribs. Both were ignored.

24. The manner in which the two deputies arrested me, battered me, and made false charges against me caused severe emotional distress. For example, while in jail, I was usually only able to sleep for only one hour at a time.

25. I suffered from extreme continuous anxiety and felt claustrophobic during my time in jail.

26. I lost vision in my left eye on three separate occasions during my time in jail.

27. When my bail was initially set at $50,000, I did not have the financial means to post bail.

28. Only when the bail was reduced to $5,000 was I able to scrape together the funds to post bail.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

DATED: January 31, 2008

_____
Michael Galati

DECLARATION OF MICHAEL GALATI